Dissenting Opinion filed by Circuit Judge Millett.
Wilkins, Circuit Judge:
This appeal arises from Appellant Soundboard Association's ("SBA's") challenge to a November 10, 2016 informal opinion letter (the "2016 Letter") issued by Federal Trade Commission ("FTC" or "Commission") staff. The 2016 Letter stated it was the FTC staff's opinion that telemarketing technology used by SBA's members is subject to the FTC's regulation of so-called "robocalls," and it announced the rescission of a 2009 FTC staff letter (the "2009 Letter") that had reached the opposite conclusion.
SBA filed suit seeking to enjoin rescission of the 2009 Letter. It argued the 2016 Letter violated the Administrative Procedure Act ("APA") because it was a legislative rule issued without notice and comment and because the FTC's robocall regulation unconstitutionally restricted speech on the basis of content. The FTC opposed both these arguments and also disputed that the 2016 Letter was reviewable final agency action. The District *1263 Court concluded the 2016 letter qualified as reviewable final agency action, but the court granted summary judgment for the FTC on the grounds that the 2016 Letter was an interpretive rule not subject to notice and comment and that the interpretation stated in the letter survived First Amendment scrutiny.
We conclude that because the 2016 staff opinion letter does not constitute the consummation of the Commission's decisionmaking process by its own terms and under the FTC's regulations, it is not final agency action. As SBA concedes, its speech claims are pleaded as APA claims under 5 U.S.C. § 706(2)(B) and cannot proceed without final agency action. We therefore vacate the decision below and dismiss the case for failure to state a cause of action under the APA.
I.
A.
SBA is a trade association for companies that manufacture or use "soundboard" telemarketing technology ("soundboard"). Soundboard enables telemarketing agents to communicate with customers over the phone by playing prerecorded audio clips instead of using the agent's live voice. The agent can choose a pre-recorded clip to ask questions of or respond to a customer, while retaining the ability to break into the call and speak to the customer directly. Soundboard also enables agents to make and participate in multiple calls simultaneously. According to SBA, soundboard provides many advantages to telemarketers, including ensuring accurate communication of information and disclaimers, improving call-center performance and cost-effectiveness, and employing individuals who would otherwise have difficulty being understood over the phone due to accent or disability. J.A. 85-86.
The FTC regulates telemarketing pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994, which directs the Commission to "prescribe rules prohibiting deceptive ... and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). In 1995, the Commission promulgated the Telemarketing Sales Rule ("TSR"), which restricts telemarketing to certain times of day, creates the "do-not-call" list, and imposes other requirements to prevent fraud, abuse, and intrusions on customer privacy. 60 Fed. Reg. 43842 (Aug. 23, 1995) ; 16 C.F.R. § 310.4(b)(ii), (c). In 2003, the Commission amended the TSR to more closely regulate "predictive dialing," which places multiple simultaneous calls for a single call-center agent and, therefore, can result in "call abandonment"-i.e., abruptly hanging up-when too many customers answer the phone. The 2003 amendment prohibited telemarketers from failing to connect a customer to an agent within two seconds of the customer's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv). The amendment thus effectively prohibited outbound telemarketing campaigns consisting "solely of prerecorded messages"-colloquially known as robocalls-because "consumers who receive a prerecorded message would never be connected to a sales representative." 73 Fed. Reg. 51,164, 51,165 (Aug. 29, 2008).
In 2008, the Commission amended the TSR to prohibit telemarketers from "initiating any outbound telephone call that delivers a prerecorded message" without "an express agreement, in writing" from the consumer with language demonstrating the individual customer's consent to receiving such calls from that telemarketer. Id. at 51,184 ; 16 C.F.R. § 310.4(b)(1)(v)(A). The express-written-consent requirement does not apply to calls made on behalf of charitable organizations intended to "induce *1264 a charitable contribution from a member of, or previous donor to," the organization, as long as the donor can opt out of such calls. 16 C.F.R. § 310.4(b)(1)(v)(B). The Commission justified this exception on the grounds that members and prior donors have consented to receiving future charitable solicitation calls and, as a result, have a reduced privacy interest vis-à-vis a charitable organization's speech interest. See 73 Fed. Reg. at 51,193 -94.
In promulgating the 2008 amendments, the Commission explained that the comments it received from customers and industry showed "the reasonable consumer would consider interactive prerecorded telemarketing messages to be coercive or abusive of such consumer's right to privacy. The mere ringing of the telephone to initiate such a call may be disruptive; the intrusion of such a call on a consumer's right to privacy may be exacerbated immeasurably when there is no human being on the other end of the line." Id. at 51,180. The Commission also rejected the industry's argument that an interactive opt-out mechanism for robocalls would adequately protect consumer privacy, reasoning that the "volume of telemarketing calls from multiple sources is so great that consumers find even an initial call from a telemarketer or seller to be abusive and invasive of privacy." Id. (quotation marks omitted).
B.
Before the TSR went into effect in September 2009, a telemarketer and soundboard user, Call Assistant LLC ("Call Assistant"), submitted a "request for a FTC Staff Opinion Letter" regarding whether Call Assistant's use of soundboard was subject to the 2008 amendments. J.A. 230 (emphasis in original). In its request, Call Assistant represented that "[a]t all times" during a soundboard call, "even during the playing of any recorded segment, the agent retains the power to interrupt any recorded message." J.A. 37. It also represented that during soundboard calls, "live agents hear every word spoken by the call recipient, and determine what is said" in response. J.A. 38.
On September 11, 2009, FTC staff responded with an "informal staff opinion" letter from Lois Greisman, the FTC's Associate Director of the Division of Marketing Practices (the "2009 Letter"). J.A. 37. The 2009 Letter stated that "[b]ased on the description of the technology included in [Call Assistant's] letter," "the staff of the [FTC] has concluded that the 2008 TSR Amendments ... do not prohibit telemarketing calls using" soundboard. J.A. 38. Greisman explained that the robocall regulation "prohibit[s] calls that deliver a prerecorded message and do not allow interaction with call recipients in a manner virtually indistinguishable from calls conducted by live operators. Unlike the technology that [Call Assistant] describe[s], the delivery of prerecorded messages in such calls does not involve a live agent who controls the content and continuity of what is said to respond to concerns, questions, comments-or demands-of the call recipient." Id. Greisman quoted the FTC's justification for the TSR's prohibition on robocalls, which "convert the telephone from an instrument for two-way conversations into a one-way device for transmitting advertisements." Id. Given Call Assistant's assertions that soundboard calls featured a "live human being continuously interact[ing] with the recipient of a call in a two-way conversation," "in Staff's view," soundboard use did not implicate the purposes of the TSR. Id.
The 2009 Letter expressly conditioned this conclusion on the factual representations in Call Assistant's request for a staff *1265 opinion, and Greisman advised Call Assistant that the letter did not represent the views of the Commission:
Please be advised that this opinion is based on all the information furnished in your request. This opinion applies only to the extent that actual company practices conform to the material submitted for review. Please be advised further that the views expressed in this letter are those of the FTC staff. They have not been reviewed, approved, or adopted by the Commission, and they are not binding upon the Commission. However, they do reflect the opinions of the staff members charged with enforcement of the TSR.
J.A. 39.
After issuing the 2009 Letter, the Commission began to receive consumer complaints and to observe media reports about the use of soundboard that conflicted with factual representations made by Call Assistant. This included complaints that consumers "are not receiving appropriate recorded responses to their questions or comments," that "no live telemarketer intervenes to provide a human response when requested to do so," and that "the call is terminated in response to consumers['] questions." J.A. 30-31. FTC staff also collected evidence from consumers and industry stakeholders that "some companies are routinely using soundboard technology" to "conduct separate conversations with multiple consumers at the same time," and observed that companies engaging in these practices were using the 2009 Letter as a defense against consumer lawsuits. J.A. 31; 225.
The FTC staff began to reconsider the 2009 Letter. In early 2016, FTC staff contacted telemarketing industry groups for input and held meetings at which industry representatives made presentations about soundboard. In a February 2016 meeting, "representatives of [a telemarketing trade group] acknowledged that soundboard technology is frequently utilized in a matter to allow one live agent to handle multiple calls simultaneously." J.A. 226. A trade group representative also told FTC staff "that if the FTC enforced a requirement that one agent could only manage one call at a time, no call center would use soundboard technology because it would not be cost effective-i.e., the capital expenditure in implementing soundboard ... only made business sense if a call center could increase the volume of calls its agents could handle." Id. During this time SBA argued to FTC staff that the practices described in consumer complaints were contrary to the trade groups' code of conduct, and that bad actors should be punished instead of the entire soundboard industry. J.A. 147-48.
On November 10, 2016, FTC staff issued a letter (the "2016 Letter") concluding that the TSR did apply to soundboard calls and rescinding the 2009 Letter effective May 12, 2017. The 2016 Letter was from Greisman, as well. It noted the 2009 Letter was premised on factual representations made by Call Assistant. But based on consumer complaints, media reports, meetings with industry representatives, and other data points, by 2016 the FTC staff believed the factual bases of the 2009 Letter were faulty. Specifically,
A fundamental premise of [the] September 2009 letter was that soundboard technology was a surrogate for the live agent's actual voice. A human being cannot conduct separate conversations with multiple consumers at the same time using his or her own voice. Nonetheless, some companies are routinely using soundboard technology in precisely this manner [of enabling an agent to handle multiple simultaneous calls] ... Indeed, Call Assistant noted publicly that one of *1266 the advantages of its technology is that an agent can conduct multiple calls simultaneously.
J.A. 31-32 (internal quotation marks omitted).
The 2016 Letter also stated that because soundboard users play prerecorded audio files to communicate with customers, soundboard calls fall within the plain language of the TSR's prohibition on "any outbound telephone call that delivers a prerecorded message." J.A. 30. Accordingly, the letter reasoned,
Given the actual language used in the TSR, the increasing volume of consumer complaints, and all the abuses we have seen since we issued the September 2009 letter, we have decided to revoke the September 2009 letter. It is now staff's opinion that outbound telemarketing calls that utilize soundboard technology are subject to the TSR's prerecorded call provisions because such calls do, in fact, "deliver a prerecorded message" as set forth in the plain language of the rule. Accordingly, outbound telemarketing calls made using soundboard technology are subject to the provisions of 16 C.F.R. § 310.4(b)(1)(v), and can only be made legally if they comply with the requirements [applicable to robocalls].
J.A. 32 (footnote omitted).
The 2016 Letter provided that "[i]n order to give industry sufficient time to make any necessary changes to bring themselves into compliance, the revocation of the September 2009 Letter will be effective six months from today, on May 12, 2017. As of that date, the September 11, 2009 letter will no longer represent the opinions of FTC staff." J.A. 33. The 2016 Letter concluded by stating that "the views expressed in this letter are those of the FTC staff, subject to the limitations of 16 C.F.R. § 1.3. They have not been approved or adopted by the Commission, and they are not binding upon the Commission. However, they do reflect the views of staff members charged with enforcement of the TSR."[1] Id.
C.
SBA sought to enjoin the revocation of the 2009 Letter and what it characterized as a compliance deadline of May 12, 2017. It argued before the District Court that the 2016 Letter is a legislative rule requiring notice and comment under 5 U.S.C. § 553 because it expanded the scope of the TSR to reach soundboard. It also argued that to the extent the 2016 Letter amends the TSR to apply to soundboard, it is a content-based speech restriction that "treat[s] speech tailored for first-time donors differently than speech tailored for previous donors." J.A. 191. The Commission moved for summary judgment. It argued the 2016 Letter was not a reviewable final agency action, and in any event was an interpretive rule not subject to notice and comment. The Commission also argued that the SBA's affirmative First Amendment challenge was barred by the APA's six-year statute of limitations, but that on the merits the TSR was a reasonable time, place, and manner restriction that survived intermediate scrutiny.
The District Court consolidated the motions as cross-motions under Rule 56 and granted summary judgment for the Commission. The court concluded the 2016 Letter was a final agency action but held it was an interpretive rule not subject to notice and comment, and that the TSR's application to SBA survived the intermediate *1267 scrutiny applicable to regulations of commercial speech. SBA timely appealed.
II.
This court "review[s] de novo a district court's decision to grant summary judgment, viewing the evidence in the light most favorable to the non-moving party. A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin. , 452 F.3d 798, 805 (D.C. Cir. 2006) (quotation marks omitted).
The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. While the requirement of finality is not jurisdictional, without final agency action, "there is no doubt that appellant would lack a cause of action under the APA." Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n , 324 F.3d 726, 731 (D.C. Cir. 2003) ; Flytenow, Inc. v. FAA , 808 F.3d 882, 888 (D.C. Cir. 2015). Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear , 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks omitted); see also Scenic Am. v. U.S. Dep't of Transp. , 836 F.3d 42, 55-56 (D.C. Cir. 2016). "An order must satisfy both prongs of the Bennett test to be considered final." Sw. Airlines Co. v. U.S. Dep't of Transp. , 832 F.3d 270, 275 (D.C. Cir. 2016).
In evaluating the first Bennett prong, this Court considers whether the action is "informal, or only the ruling of a subordinate official, or tentative." Abbott Labs. v. Gardner , 387 U.S. 136, 151, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (internal citations omitted). The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue. See Holistic Candlers & Consumers Ass'n v. FDA , 664 F.3d 940, 944 (D.C. Cir. 2012) (relying upon the FDA Manual's description of warning letters as preceding enforcement action to conclude they "do not mark the consummation of FDA's decisionmaking"); Reliable Automatic Sprinkler , 324 F.3d at 732, 733 (holding a letter interpreting a safety regulation was not a final agency action because "the Commission itself ha[d] never considered the issue," and "[t]he Act and the agency's regulations clearly prescribe a scheme whereby the agency must hold a formal, on-the-record adjudication before it can make any determination that is legally binding."); see also Sw. Airlines , 832 F.3d at 275 (In evaluating finality, this Court also looks to "the way in which the agency subsequently treats the challenged action.").
Because each prong of Bennett must be satisfied independently for agency action to be final, deficiency in either is sufficient to deprive SBA of a cause of action under the APA. Sw. Airlines , 832 F.3d at 275.
III.
A.
SBA argues, and the District Court concluded below, that the extensive investigative efforts by FTC staff and some definitive language in the 2016 Letter render it the consummation of agency decisionmaking for "all intents and purposes."
*1268 Soundboard Ass'n v. FTC , 251 F.Supp.3d 55, 64 (D.D.C. 2017). We disagree.
There is no dispute that the 2016 Letter was "informal" and "only the ruling of a subordinate official," and not that of any individual Commissioner or of the full Commission. Abbott Labs. , 387 U.S. at 151, 87 S.Ct. 1507 (citations omitted). It is readily distinguishable from the final agency action in Frozen Food Express v. United States , relied upon by SBA and the decision below. That case involved a formal, published report and order of the Interstate Commerce Commission, not its staff, following an investigation and formal public hearing. 351 U.S. 40, 41, 76 S.Ct. 569, 100 L.Ed. 910 (1956). Similarly, unlike the jurisdictional determination in U.S. Army Corps of Engineers v. Hawkes Co. , which was issued by the agency and expressly deemed "final agency action" by regulation, was "valid for a period of five years," and was "bind[ing on] the Corps for five years," --- U.S. ----, 136 S.Ct. 1807, 1814, 195 L.Ed.2d 77 (2016), the 2016 Letter is issued by staff under a regulation that distinguishes between Commission and staff advice, is subject to rescission at any time without notice, and is not binding on the Commission. 16 C.F.R. § 1.3(c). This factor also distinguishes this case from Sackett v. EPA , 566 U.S. 120, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012), in which a binding enforcement order issued by the EPA Administrator was deemed the consummation of the agency's decisionmaking.
The 2016 Letter does not represent otherwise. It explicitly and repeatedly states that it expresses the views of "staff," and it explains that such views do not bind the Commission. While the letter does present a conclusive view that "outbound telemarketing calls made using soundboard are subject to [the TSR] ... and can only be made legally if they required with [the TSR]," J.A. 32, it characterizes this as "staff's opinion" and nowhere presents this as the conclusive view of the Commission. To the contrary, the 2016 Letter is clear that agency staff is "merely expressing its view of the law," AT&T v. EEOC , 270 F.3d 973, 976 (D.C. Cir. 2001) (emphasis added). Indeed, nonbinding staff advice is precisely what Call Assistant sought in its specific "request for a FTC Staff Opinion Letter," J.A. 230 (emphasis in original).
True, the fact that staff and not an agency head has taken a challenged action does not end the finality inquiry. But the 2016 Letter differs significantly from decisions by subordinate officials we have deemed final agency action. Unlike the guidance at issue in Appalachian Power v. EPA , the 2016 Letter is not binding on Commission staff "in the field" or on third parties such as state permitting authorities. Cf. 208 F.3d 1015, 1022, 1023 (D.C. Cir. 2000) ("The short of the matter is that the Guidance, insofar as relevant here, is final agency action, reflecting a settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain Title V permits in order to continue operating."). Nor is SBA trapped without recourse due to the indefinite postponement of agency action. Cf. Her Majesty the Queen in Right of Ontario v. EPA , 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[A]lthough ... the EPA concededly made no final decision on petitioners' request that the section 115 remedial process be initiated, it clearly and unequivocally rejected ... petitioners' requests for a separate proceeding[.]"). SBA concedes it could, but did not, seek an opinion from the Commission itself-and SBA remains free to do so today. Cf. Sackett , 566 U.S. at 127, 132 S.Ct. 1367 (holding an order issued by the agency itself to be final when "not subject to further agency review");
*1269 Ciba-Geigy Corp. v. EPA , 801 F.2d 430, 437 (D.C. Cir. 1986) ("Having definitively stated its position that Ciba-Geigy has no statutory right to a cancellation hearing, EPA has provided its final word on the matter short of an enforcement action." (alterations, citation, and quotation marks omitted) ).
The dissent repeatedly cites Sackett as authority for its conclusion that informal staff advice is final agency action. Sackett is a very different case. There, the EPA Administrator issued a compliance order against the Sacketts under the "Enforcement" section of the Clean Water Act, 33 U.S.C. § 1319. The Administrator's order made enforceable factual findings and legal conclusions that the Sacketts' property included "waters of the United States" subject to the Clean Water Act, and that the Sacketts therefore had committed violations of the Clean Water Act. 566 U.S. at 124-25, 132 S.Ct. 1367. The order directed the Sacketts "immediately [to] undertake activities to restore" their property "in accordance with [an EPA-created] Restoration Work Plan" and to provide to EPA employees "access to the Site ... [and] access to all records and documentation related to the conditions at the Site." Id. at 125, 132 S.Ct. 1367 (alterations in original). The Sacketts sought a hearing on the order from the EPA, which EPA denied, prompting the Sacketts (having no other recourse) to bring suit in the district court.
The Supreme Court analyzed the Administrator's order separately under each prong of Bennett . Under the first prong, the Administrator's order was the consummation of the agency's decisionmaking process because the Sacketts sought a hearing, and when that request was denied, "the 'Findings and Conclusions' that the compliance order contained were not subject to further agency review.' " 566 U.S. at 127, 132 S.Ct. 1367. This alone sufficiently distinguishes the informal staff opinion in this case from the Administrator's enforcement order in Sackett , as the informal staff opinion is "subject to further agency review" in at least two ways. First, SBA is and has always been able to request an opinion from the Commission itself; given that Call Assistant specifically emphasized that they sought a "Staff Opinion Letter," a request for Commission advice remains an available alternative of which the requestors of the 2009 Letter were well aware-and which they chose not to pursue. Second, if at some future date the FTC staff make the further decision to recommend a TSR enforcement action against a soundboard user, proceeding on that recommendation would require the Commission to decide-itself, for the first time-whether the 2016 Letter's interpretation of the TSR is correct, and to vote on whether to issue a complaint. 16 C.F.R. § 3.11. SBA seeks a shortcut around both these decision points, but unlike the Sacketts, SBA is neither out of regulatory review options nor subject to an order or enforcement action issued from the head of the agency itself.
Further, the FTC regulations expressly delineate between advice from the Commission and advice from its staff. The manner in which an agency's governing statutes and regulations structure its decisionmaking processes is a touchstone of the finality analysis. See Holistic Candlers , 664 F.3d at 944. Under FTC rules, when the Commission itself gives advice, it may only rescind or revoke that advice upon "notice ... to the requesting party so that he may discontinue the course of action taken pursuant to the Commission's advice." 16 C.F.R. § 1.3(b). Advice from the Commission also constrains its future enforcement authority: It "will not proceed against the requesting party with respect to any action taken in good faith reliance upon the Commission's advice under this *1270 section, where all the relevant facts were fully, completely, and accurately presented to the Commission ...." Id.
A separate provision governs "[a]dvice rendered by the staff." 16 C.F.R. § 1.3(c). Staff advice is given "without prejudice to the right of the Commission to later rescind the advice and, where appropriate, to commence an enforcement proceeding," and § 1.3(c) has no notice requirement and provides no safe harbor for reasonable reliance on the advice.[2] Id. Unlike Commission opinions, staff advice cannot constrain the Commission's future enforcement authority. Thus, contrary to SBA's assertions, the 2016 Letter's disclaimer is not fairly read as meaningless "boilerplate." Rather, the 2016 Letter reflects and cites specific FTC regulations that structure the agency's decisionmaking processes. Cf. Scenic Am. , 836 F.3d at 56 (dismissing as "boilerplate" an agency's vague statement that it "may provide further guidance in the future as a result of additional information"). While an opinion from the Commission itself might constitute the consummation of its decisionmaking process, the 2016 Letter from FTC staff does not.
The dissent interprets the FTC's regulations differently, concluding that the Commission has "delegated"-in the dissent's terms-its advice function such that the staff actually speaks directly for the Commission, despite express disclaimers and regulatory distinctions between staff and Commission advice. Dissenting Op. at 1276. We do not agree.
Quoted in full, Section 1.3(a) provides, "[o]n the basis of the materials submitted, as well as any other information available, and if practicable, the Commission or its staff will inform the requesting party of its views." 16 C.F.R § 1.3(a) (emphasis added). The dissent's theory of complete "delegation" of the Commission's interpretation and enforcement authority, such that staff and Commission advice are interchangeable for finality purposes, is simply incorrect. When the Commission delegates its authority to staff, it does so expressly. Cf. 16 C.F.R. § 2.1 ("The Commission has delegated to the Director, Deputy Directors, and Assistant Directors of the Bureau of Competition, the Director, Deputy Directors, and Associate Directors of the Bureau of Consumer Protection and, the Regional Directors and Assistant Regional Directors of the Commission's regional offices, without power of redelegation, limited authority to initiate investigations.") (emphasis added); § 2.14(d) ("The Commission has delegated to the Directors of the Bureaus of Competition and Consumer Protection, their Deputy Directors, the Assistant Directors of the Bureau of Competition, the Associate Directors of the Bureau of Consumer Protection, and the Regional Directors, without power of redelegation, limited authority to close investigations.") (emphasis added). By contrast, 16 C.F.R. §§ 1.1 et seq. say nothing about delegation. Rather, the Commission "has authorized its staff to consider all requests for advice and to render advice, where practicable, in those circumstances in which a Commission opinion would not *1271 be warranted."[3] 16 C.F.R. § 1.1(b). The fact that the Commission "has authorized" staff to give advice on matters of lesser importance does not transform staff views into the Commission's views. To the contrary, under the plain text of the 16 C.F.R. § 1.1, if "a Commission opinion [is] not [ ] warranted," a Commission opinion is not provided. Only a staff opinion is provided. See 16 C.F.R. § 1.3(b), (c).
B.
The dissent criticizes the majority for "measur[ing] finality exclusively from the Commission's vantage point" because we conclude that failure to meet Bennett 's first prong is sufficient to dismiss for want of finality. Dissenting Op. at 1274. But it is undisputed that both prongs of Bennett v. Spear must be satisfied independently. Sw. Airlines , 832 F.3d at 275. Bennett directs courts to look at finality from the agency's perspective (whether the action represents the culmination of the agency's decisionmaking) and from the regulated parties' perspective (whether rights or obligations have been determined, and legal consequences flow). Deficiency from either perspective is sufficient to dismiss a claim. Thus, there is no need to reach the second Bennett prong if the action does not mark the consummation of agency decisionmaking. We therefore need not do so here.
We respond to some of the dissent's concerns out of respect for our colleague and to clarify the appropriate finality analysis. The dissent is troubled that judicial review of informal agency advice would be unavailable here where, according to SBA's characterization, companies have relied on the 2009 Letter in conducting and growing their operations. Certainly, reasonable reliance interests of regulated parties should often be considered when an agency changes course. But the facts matter. SBA's members do not have any significant or reasonable reliance interests in the 2009 Letter, either by the letter's own terms or under FTC regulations. Call Assistant specifically requested an informal "Staff Opinion Letter" (emphasis Call Assistant's) on the applicability of the TSR to soundboard; in that request, Call Assistant made representations about how it used soundboard in order to provide the staff with a factual basis for such an opinion. J.A. 230. In express reliance on these factual representations, the FTC staff stated its opinion that, if these particular facts were true, the TSR would not prohibit the use of soundboard, at least for the uses described by Call Assistant. J.A. 38. The 2009 Letter emphasized that the staff opinion extended only to soundboard use as factually portrayed in Call Assistant's letter soliciting the opinion. Call Assistant did not state anywhere in its letter or supporting materials that call-center agents would use soundboard to field multiple simultaneous calls; instead, Call Assistant highlighted how the technology would allow an agent to better interact with a caller and accurately convey information to a caller. See J.A. 230-35. Thus, even if the 2009 Letter had been binding on the Commission, it did not bless the practice of using soundboard to field multiple calls simultaneously, and it therefore does not appear to be reasonable for a company to rely upon the 2009 Letter for such uses. SBA members also did not take *1272 any affirmative steps to apprise the FTC that soundboard is frequently not used in the manner represented by Call Assistant, even after the issuance of the 2009 Letter; instead, the FTC had to learn that this from its own investigation after receiving numerous consumer complaints and reviewing news reports. If industry actors such as Call Assistant had corrected the factual misrepresentations (by omission) as proactively as they solicited the staff opinion, seven years might not have passed before FTC staff reconsidered and rescinded the 2009 Letter.[4]
Whether a regulated entity is a small business or a large trade association, the bottom line is the same for the finality of an agency's action. Both prongs of Bennett must be met. The dissent argues that somehow the impact on industry should have been accounted for in the staff's decisionmaking, and the failure to account for practical impacts somehow makes informal staff advice more final. That approach bootstraps Bennett 's second prong into its first. The point where an agency's decisionmaking process is complete cannot be pulled to and fro by the gravity of any particular decision for an industry. Such an unmoored approach to evaluating the finality an agency's decision would create uncertainty for everyone-the agency, the industry, and the courts.
Indeed, if regulated entities could assert a dramatic impact on their industry no matter who issued the advice or under what regulatory authority, the first prong of Bennett would have little meaning. Say some advice is issued by a paralegal, who writes a letter on no authority but his or her own personal opinion. And say that advice-if adopted by the Commission itself-could have significant industry consequences. Under the dissent's approach, it is unclear what would stop a regulated party from claiming that what matters for finality is potential industry impact, not whether a paralegal's opinion constitutes the culmination of agency decisionmaking. This is one reason why precedent emphasizes the importance of who made a decision, and how an agency's regulations delineate responsibility for and the bindingness of such a decision. See Abbott Labs. , 387 U.S. at 151, 87 S.Ct. 1507 ; Holistic Candlers , 664 F.3d at 944. The fact that an opinion of someone at an agency could potentially impact a regulated entity says nothing about whether that opinion is the culmination of the agency's decisionmaking.[5]
*1273 In addition, we do not believe finality can be measured by what the industry claims it will do or stop doing. The test is what legal and practical consequences will flow from the agency's action. Here, it is unclear that much, if any, of the claimed consequences for industry could properly be attributed to the 2016 Letter at all. Even from this underdeveloped record it appears that the practices that prompted the 2016 Letter-such as soundboard agents handling multiple calls at a time-may not be permissible under the 2009 Letter's interpretation of the TSR. In addition, even if the staff's interpretation were adopted or enforced by the Commission, many permissible soundboard uses remain. More importantly, if the soundboard industry built its business on practices that do not conform to the facts as represented by Call Assistant, they have no cause to complain about the impact of rescinding the 2009 Letter on those practices. In any event, under FTC regulations, the 2009 Letter is not and could not be a basis for legally cognizable reliance interests because it was not issued by the Commission. 16 C.F.R. § 1.3(b).
Finally, the dissent relies heavily again on Sackett to argue that the 2009 and 2016 Letters constitute final agency action under Bennett 's second prong. While we need not and do not conduct a full analysis of this prong, we note significant differences between the EPA Administrator's order setting out express legal obligations in Sackett and the informal staff advice here. The Sackett Court concluded that "through the order, the EPA 'determined' 'rights or obligations' " because, "[b]y reason of the order, the Sacketts have the legal obligation to 'restore' their property ... and must give the EPA access to their property and to 'records and documentation related to the conditions at the Site.' " Sackett , 566 U.S. at 126, 132 S.Ct. 1367. In contrast, the informal staff advice in the 2016 Letter offers an interpretation of the TSR, but it fixes no specific, legally enforceable rights or legal obligations of the kind created by the Administrator's order in Sackett . As the FTC conceded, the 2016 Letter might be used to show an SBA member's knowledge regarding the meaning of the TSR and, therefore, could be evidence of willfulness should an SBA member violate the TSR . But, unlike a violation of the Administrator's order in Sackett , a so-called "violation" of the 2016 Letter does not independently trigger any penalties.
*1274 We respect our dissenting colleague's concern for consequences to the soundboard industry in this case, but we cannot agree that these consequences are sufficient to render informal FTC staff advice final agency action.
IV.
SBA also argues the 2016 Letter violates its free-speech rights by subjecting it to the TSR's alleged content-based restrictions on constitutionally protected speech. As SBA's counsel conceded at oral argument, however, SBA pleaded the alleged free-speech violations as APA claims only, not standalone First Amendment claims. We therefore need not reach the FTC's arguments that SBA's speech claims are either forfeited or time-barred, as these claims must also be dismissed for want of final agency action.[6]
* * *
Pursuant to FTC regulations and by its own terms, the 2016 Letter does not constitute the consummation of the Commission's decisionmaking process regarding the applicability of the TSR to soundboard technology. Without final agency action, SBA lacks a cause of action under the APA. We therefore vacate the decision below and dismiss the complaint for failure to state a claim.
So ordered.

16 C.F.R. § 1.3(c) provides that "[a]dvice rendered by the staff is without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement proceeding."

We note a textual distinction between § 1.3(b), which provides that the Commission may "rescind or revoke" its own advice, and § 1.3(c), which provides only that the Commission may "rescind" staff advice. We conclude this is a distinction without a difference. Courts and agencies frequently use the terms "rescind"/"rescission" and "revoke"/"revocation" interchangeably, e.g. , Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 51-52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and we find no indication that "revoke" must have an independent meaning here. See Lamie v. U.S. Trustee , 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("[O]ur preference for avoiding surplusage constructions is not absolute.").

To authorize is "to empower; to give a right or authority to act" generally. Black's Law Dictionary 122 (5th ed. 1979); see also id. at 121 (defining "authority" as "permission"). Delegation is narrower and more specific-to delegate is to give someone authority to act specifically on one's behalf or in one's stead . See id. at 383 (defining "delegate" as "a person who is delegated or commissioned to act in the stead of another"). Delegation may be one species of authorization, but the distinction is material.

The possibility of immediate judicial review of informal advice in these circumstances might make guidance harder for industry to request and receive. Not only might staff be less willing to give advice, the advice that is released may take longer and be more costly to develop. Further, allowing informal staff opinions of this sort to be brought into court immediately would cast judges in a role for which they are particularly ill-prepared: providing advisory opinions about the policy merits and applicability of agency actions on an underdeveloped record. The broad interpretation of finality advocated for by the dissent would, contrary to Abbott Labs. , "entangle[e] [courts] in abstract disagreements over administrative policies." 387 U.S. at 148, 87 S.Ct. 1507. While it may serve the short-term interest of SBA's members to bring this particular grievance to court immediately, the incentives of such a result would harm the interest of all regulated parties in access to informal advice and compliance help in general. These practicalities are reflected in the plain text of the FTC regulations that distinguish Commission advice from staff advice and that provide staff advice more flexibility by making it rescindable without notice and giving it no precedential effect.

Our dissenting colleague appears to believe that FTC staff has an obligation to proactively investigate whether the facts being represented by an entity requesting advice are false or incomplete. Dissenting Op. at 1284. This is mistaken. Commission regulations provide that the Commission or the staff will provide advice "[o]n the basis of the materials submitted." § 1.3(a). There is no obligation on the part of FTC staff to investigate further. In fact, FTC regulations expressly provide that "a request for advice will ordinarily be considered inappropriate where ... [a]n informed opinion cannot be made or could be made only after extensive investigation, clinical study, testing, or collateral inquiry." 16 C.F.R. § 1.1 (emphasis added). The fact that the regulations authorize "the Commission or its staff" to use "any other information available" when providing advice "if practicable" simply allows-but does not require-the use of any other information that may be in the agency's possession. A request for informal staff advice is not a petition for rulemaking, nor is it an adjudication requiring investigative fact-finding by the agency. The onus is on requestors of advice to provide accurate information to form the basis of that advice-notably, FTC regulations provide a safe harbor against enforcement only "where all the relevant facts were fully, completely, and accurately presented to the Commission." 16 C.F.R. § 1.3(b). See also 16 C.F.R. § 1.2(a) ("Submittal of additional facts may be requested [by the agency from the party requesting advice] prior to the rendering of any advice."). Therefore, as both the FTC's regulations and the staff advice letters make clear, staff or Commission advice is only as good as the facts on which it is based, and at least in the circumstances here, the primary responsibility for developing and presenting those facts lies with the requestor.

We note a subtle but important distinction between prudential doctrines such as ripeness, where the presence of constitutional claims may favor judicial review, and the APA's statutory prerequisite of final agency action, without which no cause of action or claim exists. See John Doe, Inc. v. DEA , 484 F.3d 561, 567 (D.C. Cir. 2007) (opinion of Edwards, J.) ("[E]ven if exhaustion, ripeness, and finality may be difficult to distinguish in some contexts, they must be carefully delineated when, as here, finality is a statutory jurisdictional prerequisite rather than merely a precaution related to concreteness and institutional capacity."); Ticor Title Ins. Co. v. FTC , 814 F.2d 731, 745-46 (D.C. Cir. 1987) (opinion of Williams, J.) ("[W]hile courts often mingle the three doctrines [of finality, ripeness, and exhaustion], they are analytically distinct. ... While exhaustion is directed to the steps a litigant must take, finality looks to the conclusion of activity by the agency."). Unlike reviewability doctrines developed by courts, final agency action is a statutory requirement set by Congress. We have found no decision of this Court, and no decision of any other circuit court, holding that the presence of constitutional claims eases the Supreme Court's two-part Bennett test for final agency action. Cf. Unity08 v. FEC , 596 F.3d 861, 865 (D.C. Cir. 2010) (finding First Amendment chilling concerns relevant to ripeness while explicitly distinguishing ripeness from finality of agency action); Chamber of Commerce v. FEC , 69 F.3d 600, 603-04 (D.C. Cir. 1995) (finding the presence of First Amendment speech claims to favor pre-enforcement ripeness when finality was conceded). Regardless, SBA has not argued for such a doctrinal shift.